### BURTON CADY v. THE STATE.

#### No. 1468. Decided April 27, 1898.

**Horse Theft—Drunkenness—Intent—Charge of Court.**

On a trial for horse theft, where it appeared that defendant was drunk at the time he took the horse, and that he took him for temporary use only, but afterwards sold him, and the court in effect instructed the jury that if defendant was in such condition at the time he took the horse as not to know what he was doing, and afterwards when he came to himself he formed the intent to steal the horse and convert him, he would be found guilty; Held, not the law. The fraudulent intent must have been formed at the very time of the taking; without this, no subsequent appropriation would be theft.

APPEAL from the District Court of Falls. Tried before Hon. L. B. COBB.

Appeal from a conviction for horse theft; penalty, three years imprisonment in the penitentiary.

The opinion states the case.

*Rice & Bartlett, J. J. Swann,* and *George H. Carter,* for appellant.— On question that the charge must confine the fraudulent intent and taking to the very time that the property was taken, see Read v. State, 8 Texas Crim. App., 40; Dow v. State, 12 Texas Crim. App., 343; Knutson v. State, 14 Texas Crim. App., 570; Morrison v. State, 17 Texas Crim App., 34; Warren v. State, 17 Texas Crim. App., 207; Wilson v. State, 20 Texas Crim. App., 662; Atterberry v. State, 19 Texas Crim. App., 401; Guest v. State, 24 Texas Crim. App., 235; Cunningham v. State, 27 Texas Crim. App., 479; Williams v. State, 30 Texas Crim. App., 153; Nichols v. State, 28 Texas Crim. App., 105.

The following special charge was requested by the defendant, and refused by the court: The defendant requests the court to charge the jury as follows, to wit: If you believe from the evidence in this case that the

defendant took the horse of the prosecuting witness Canterberry, but that at the time of so doing he did not intend to permanently deprive the owner of the same, but only intended the same for a temporary use, to wit, that of taking a short ride, you will acquit the defendant, even though you should believe that the taking was without the consent of the said Canterberry. Johnson v. State, 36 Texas, 375; Blackburn v. State, 44 Texas, 457; Loza v. State, 1 Texas Crim. App., 488; Berg v. State, 2 Texas Crim. App., 148; Wilson v. State, 18 Texas Crim. App., 270; Dunham v. State, 3 Texas Crim. App., 465; Knutson v. State, 14 Texas Crim. App., 570; Schultz v. State, 30 Texas Crim. App., 94; Clark's Crim. Law, pp. 262, 263, et seq.

*W. W. Walling* and *Mann Trice,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of the theft of a horse, and his punishment assessed at three years confinement in the penitentiary; hence this appeal.

The evidence is uncontroverted that appellant took the horse, which was hitched in a public place in Marlin. He rode said horse out of town in broad daylight, and crossed the river, and went to William Wheelis', in the neighborhood of Lott. He stopped at Wheelis', and hired to him to pick cotton. After he had remained there about a week, he sold the horse to Wheelis. In about two weeks after the taking of said horse, the owner, Canterberry, recovered him. Appellant presented two defensive theories. He proved by several witnesses that he was drinking on the day of the alleged theft, and was intoxicated. He testified for himself, and stated substantially that he had been drinking whisky during the whole of the day preceding the theft, and at the time of the taking of said horse, he was drunk to such an extent that he did not know what he was doing. He, however, gave a circumstantial account of what he did on that occasion. We quote from his testimony as follows: "I came back from the hotel to Rickleman's saloon, where I got something more to drink. After this I went into the alley back of the saloon, where Jack Bradford's wagon was. Jack wanted me to get back in the wagon, and return to the fish camp. I told him, 'No;' I was going to ride. I went in the alley, and mounted the Canterberry horse, and rode down the alley. Passed Jack Bradford, when he tried to pull me off the horse, and the horse began to rear and plunge. I then rode on out into the street, having no particular place in view; just thought of taking a ride. After riding a distance of eight or ten miles, the air and wind brought me to, somewhat. I had a terrible headache, and my only desire was to get rid of the horse. I remember stopping at some one's house on the road, and asking how far it was to Lott. I tried to follow the direction, but got lost, and went up to a house occupied by William Wheelis. I went and stayed all night there. The next day (Sunday), Mr. Wheelis noticed

that the saddle was marked 'T. K. Barton, Marlin, Texas.' He asked me about the saddle, and I told him, 'Yes,' it was made in Marlin. On Sunday night, while we were at the supper table, a negro boy came in, and said some one had stolen Mr. Marcus Canterberry's horse at Marlin. On Monday morning, Mrs. Wheelis wanted to ride to Lott, and I told her to take the horse, and ride him, which she did. I was glad for her to do this, for I thought some one would see the horse, and know him, and take him. On Monday morning I told Mr. Wheelis I got the horse in Marlin, and asked him what was the best for me to do about it. He replied that he did not know. After I was there for about a week or such matter, I let him have the horse, so I could get some money to leave the country on. I intended, after I got far enough off, to write to Mr. Canterberry and tell him where the horse was. When I got on the horse at Marlin I was drunk, did not know what I was doing, and the only thought I had was to take a ride. I did not intend and had no idea of stealing the horse."

The defensive theories presented by appellant were: First, that, at the time of the alleged theft, he was laboring under temporary insanity, produced by the recent use of whisky, and so was not in condition to form the fraudulent intent to steal; second, that he took the horse merely for the temporary purpose of taking a ride, with no intent to steal him. The court gave the jury the statutory charge on temporary insanity, produced by the recent use of intoxicating liquor, and instructed them that they could only consider the same in mitigation of the penalty they might assess against the defendant in case they found him guilty. In this connection, he further instructed the jury as follows: "If, under the evidence, you believe the defendant, at the time of taking the horse, was in such condition of mind as that he was not capable of or did not possess the specific intent to defraud the owner of the horse, by depriving him of the value thereof, and appropriating the same to his own use or benefit, then you will not convict him, unless you further find and believe from the evidence that afterwards defendant's mind was restored to such condition as that he was capable of and had the intent then and there to deprive the owner of the horse or its value and to appropriate the same to his own use or benefit, and that, acting under such intent, he retained possession of the horse, or sold him to Wheelis, intending to deprive the owner of the value of the horse, and to appropriate same to his (the defendant's) use or benefit. So, if defendant did not have the intent to steal when he took the horse, such lack or absence of intent being the result of his mental incapacity to form such intent, yet if afterwards, while still in possession of the horse, he became mentally capable of forming the intent to steal, and, while in such last mentioned mental state, he conceived and formed the intent to steal the horse, his condition of mind at the time of taking the horse will not avail to acquit him of the charge. After all, unless the intent to defraud, as above defined, existed in defendant's mind, either at the time of taking the horse or

subsequently, as above explained, the defendant is not to be convicted."
Appellant excepted to this charge, and requested the court to give the fol-
lowing special instructions: "The defendant requests the court to charge
the jury as follows, to wit: If you believe from the evidence in this case
that the defendant took the horse of the prosecuting witness, Canter-
berry, but that, at the time of so doing, he did not intend to permanently
deprive the owner of the same, but only intended the same for a tempo-
rary use, to wit, that of taking a short ride, you will acquit the defend-
ant, even though you should believe the taking was without the consent
of the said Canterberry. If you believe from the evidence that the de-
fendant took the horse of Mr. M. U. Canterberry, as charged in the in-
dictment, but that, at the time of said taking, the defendant was so drunk
as to be incapable of forming in his mind a fraudulent intent, and did
not, by reason of such drunkenness, have such fraudulent intent, you
should acquit him, notwithstanding the fact that you may further be-
lieve that, after coming to himself, he converted the same to his own use
and benefit; and, if you so believe, you will acquit the defendant, or, if
you have a reasonable doubt thereof, you will find him not guilty. You
are charged that in prosecutions of theft, that the fraudulent intent of
the taking is the essential ingredient and gist of the crime of theft, and
this intent must exist at the very time of the taking, and that no subse-
quent fraudulent intent will render the previous taking felonious. So,
in this case, if you believe that, at the time the defendant took the horse
in question, he did not intend to steal the same, but that, subsequent to
said taking, he conceived the idea of appropriating the horse to his own
use and benefit, and did in fact so appropriate him, you will find him not
guilty; or, if you have a reasonable doubt thereof, you will find him not
guilty." Said special charges were refused by the court, and appellant
excepted.

We do not believe that the evidence raised the issue of temporary in-
sanity. True, the defendant testified that he had been drinking, and
testified that he did not know what he was doing; yet he testified with
great clearness and circumstantiality, giving all the details of the trans-
action. Insanity has a distinct meaning, and, whether produced by the
recent use of whisky or other causes, it has the same meaning. It is not
mere drunkenness. The court, however, gave a charge on temporary in-
sanity, produced by the recent use of intoxicating liquor, in accordance
with the statute. And if he had stopped there, under the facts of this
case, there would have been no error. But the learned judge proceeded
further, and told the jury that if he was in such a condition at the time
he took the horse as not to know what he was doing, and afterwards when
he came to himself, he then formed the intent to steal the horse, he would
then be guilty. This is not the law. The fraudulent intent to steal must
be formed at the very time of the taking. Without this, no subsequent
appropriation will be theft. Appellant testified that he took the horse
for temporary use, merely to ride, and this statement appears plausible,

in connection with his subsequent appropriation; and the charge given with reference to the intent to steal the horse formed after the act of taking was calculated to mislead and confuse the jury. The judgment is accordingly reversed, and the cause remanded.

*Reversed and remanded.*